**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

ALC Power Road LLC,

Plaintiff,

v.

Nationwide General Insurance Company, et al.,

Defendants.

No. CV-23-02591-PHX-KML

**ORDER**

In July 2021, a car crashed into a building owned by plaintiff ALC Power Road LLC and insured by defendant Nationwide General Insurance Company. Before the repairs from that incident were completed, the building was vandalized. The car accident and vandalism resulted in two insurance claims, but only the vandalism-related claim is at issue here. Nationwide denied ALC's vandalism claim based on reasoning that only applied if November 13, 2021, was the date the vandalism occurred. ALC eventually filed this suit, claiming Nationwide's denial breached the insurance contract and constituted bad faith. Because there is no admissible evidence precluding application of the policy provision Nationwide invoked to deny coverage, Nationwide is entitled to summary judgment.

## I. Background

ALC is owned by M. Jamil Akhtar. (Doc. 93-2 at 3.) ALC's only purpose is to hold title to a piece of real property in Mesa, on which Akhtar built a building in approximately 2004. (Doc. 93-2 at 4.) In 2018, ALC leased the property and building to an entity that operated the Raging Bull Steakhouse on the site. (Doc. 93-2 at 5.) Sometime before July

2021, ALC purchased from Nationwide a Business Owner's policy that covered the property and building. On July 9, 2021, a man driving away from his doctor's office had a heart attack and crashed his car into the building, causing significant damage. The steakhouse never operated again.

On July 20, 2021, ALC reported the car incident to Nationwide. (Doc. 99-6 at 80.) Based on a conversation between Nationwide and the insurer of the driver who crashed into the building, Nationwide learned the restaurant had "closed at Easter 2021 because of slow business due to Covid" but had "planned to open back up after Labor Day 2021." (Doc. 99-6 at 79.) Around that same time, the owner of Raging Bull contacted Gurr Brothers Construction to conduct repairs. (Doc. 99-4 at 2.)

From July through August 2021, Gurr Brothers removed the car from the building, "shored up the property," and "boarded it all up." (Doc. 93-2 at 106.) According to an internal note by Nationwide, as of August 3, 2021, the building was "not vacant, but is currently unoccupied" and the steakhouse "plan[ned] to open back up later this year." (Doc. 99-6 at 71.) On September 17, 2021, a Nationwide employee inspected the exterior and interior of the building. (Doc. 93-5 at 109.) That employee concluded no repairs had been done to the building other than being boarded up. (Doc. 93-5 at 109.) The remaining background facts are disputed based on contradictory evidence provided by Sam Matei, who co-owns Gurr Brothers. (Doc. 108-1 at 6.)

In approximately May 2022, Matei executed a "Declaration" that stated "[b]etween July 20, 2021, and November 13, 2021, Gurr Brothers was on-site at the Property on a regular basis performing construction and renovation work necessary to restore and improve the Property." (Doc. 93-3 at 33.) According to Matei, "Gurr Brothers worked at the Property under my direct supervision on an average of at least one day per week between July 20, 2021 and November 13, 2021." (Doc. 93-3 at 33.)

Matei executed a similar declaration three years later. That May 1, 2025 "Unsworn Declaration Under Penalty of Perjury 28 U.S.C. § 1746" stated it was made on Matei's "personal knowledge, Gurr Brothers' records, and [his] communications related to the

repairs done" at the building. (Doc. 99-4 at 2.) The declaration recounts various events between July 2021 and "late January 2022." (Doc. 99-4 at 3–6.) Those events included someone (unidentified) from Gurr Brothers meeting with individuals at the building and Gurr Brothers employees noticing vandalism damage at the building, including damage to the roof "in late January 2022." (Doc. 99-4 at 5.) The declaration closes by asserting:

> From the time Gurr Brothers was hired on or around July 20, 2021 through time Gurr Brothers ceased its repair efforts in the Fall of 2022, Gurr Brothers, under [Matei's] supervision, was on-site at the building on an average of at least one day per week performing repairs necessary to restore and improve the building to its pre-loss state.

(Doc. 99-4 at 5.) Normally, Matei's declarations would qualify as sufficient evidence at summary judgment to establish repair work was ongoing throughout the fall of 2022. But Matei's deposition five months later painted a very different picture of Matei's knowledge, how the declarations were prepared, and what he might testify to at trial.

During the first portion of Matei's deposition on October 27, 2025, Matei was presented with Gurr Brothers's records and asked what they indicated. Matei was first asked about repair or construction activity in September 2021. The records only indicated that on September 17, 2021, an individual from Gurr Brothers met with an insurance adjuster at the building. When asked if there were any other visits during September, Matei could not recall:

> Q: Do you know whether any Gurr Brothers or subcontractors employed by Gurr Brothers visited the Raging Bull property for any reason during the month of September of 2021?
>
> A: No.
>
> Q: They didn't visit?
>
> A: I don't know if they – I don't know if they did or not.

Counsel then confirmed that Matei had no knowledge of activities during that month:

> Q: So to your knowledge, sitting here today, there were no repairs, renovation, construction, or maintenance done to the Raging Bull in the month of September of 2021; correct?
>
> A: Correct.

(Doc. 99-8 at 33.) As to October 2021, Matei testified he met with Akhtar once that month to "go over the estimate." (Doc. 99-8 at 36.) Matei could not recall whether anyone else visited the site that month. (Doc. 99-8 at 37.) Matei then claimed "[t]here was times" that month when subcontractors went to the building to inspect or take measurements, but he could not remember who, when, or how many times that occurred. (Doc. 99-8 at 37.) To his knowledge and based on his review of Gurr Brothers' business records at the deposition, no employees or subcontractors performed "any maintenance, renovation, repair or construction" at the site in October 2021. (Doc. 99-8 at 37.)

Matei was also asked about activities in November 2021. That month there were some developments regarding finalizing the repair estimate. (Doc. 99-8 at 39.) Matei agreed, however, that as of November 11, 2021, Gurr Brothers had not begun any restoration efforts other than initially shoring up the building in August. (Doc. 99-8 at 39.) There were no records of any work done on the building in November 2021, and when asked if he could recall "any subcontractors" visiting the building in November 2021, he said "No." (Doc. 99-8 at 40.)

Finally, Matei was asked about vandalism at the property. Matei testified that electricians discovered extensive damage in early January 2022 but he could not remember the exact date. Matei confirmed, however, that the vandalism occurred before January 4, 2022.

> Q: So as far as the date that the vandalism occurred, you just know it was sometime either January 4th or prior; correct?
>
> A: Exactly.

(Doc. 99-8 at 41.) That pre-January 4 vandalism included "all the electrical had been ripped out of the box" and "the HVAC units were completely dismantled." (Doc. 99-8 at 41.)

Matei's testimony when his deposition continued a few days later got even stranger. Matei was first asked about his May 2022 declaration. (Doc. 93-2 at 100.) Matei recognized the declaration and explained his "attorneys helped [him] write it." (Doc. 93-2 at 101.) When asked which attorneys, Matei explained "I think it was Dr. Akhtar's team" and, when

pressed, agreed Akhtar's attorney had drafted the declaration for him to sign. (Doc. 93-2 at 101.) When asked whether he could testify that work was being done from September 1, 2021, to November 13, 2021, Matei stated "I honestly don't remember." (Doc. 93-2 at 101.) And when asked about the portion of the declaration stating Gurr Brothers was working on the location at least one day per week, Matei agreed he had no memory of that: "I don't know what – who was what. . . . But I can't tell you dates." (Doc. 93-2 at 102.)

Matei was then asked about his May 2025 declaration. When asked if he had seen that document before Matei initially said "I don't know" but then stated "I think I did write this thing. I think it was written with me and Sam Wang [an attorney], I believe. We were going through – yes, I remember me doing this thing with an attorney." (Doc. 93-2 at 105.) Matei described his declaration as:

> I think this is a timeline of how things were going on. But yeah, that seems pretty accurate, from what I'm looking at. Me sitting here right now, I don't know the date. I honestly don't know the dates anymore.

When asked how he created the "timeline" reflected in the declaration, Matei stated

> It would have been me in talking with the trades, me talking with – I don't remember how I got to this thing, to this timeline. It's bad. I don't know how I actually created this thing. But if I created this thing like this, I did it, especially – it was done probably with me sitting down with the attorneys and breaking it all apart, making phone calls, talking with the staff at the office. That's how I would have done it, or going through the memory that I just remembered.

(Doc. 93-2 at 105.)

So in his declarations, Matei claimed someone from Gurr Brothers was on-site "at least one day per week" from either July 2021 through "November 13, 2021" (Doc. 93-3 at 33), or July 2021 through "Fall of 2022" (Doc. 99-4 at 5). The May 2025 declaration also asserted the vandalism damage occurred in late January 2022. But at his deposition in October 2025, Matei stated Akhtar's attorney had drafted the first declaration and Matei could not remember if the statements in it were accurate. For the second declaration just five months earlier, Matei could not remember if he created it or, if he did, the process he

used. Matei also no longer had any personal knowledge of any on-site activities in the fall of 2021 and no records demonstrating any construction or renovation activities. And Matei's knowledge regarding the vandalism incident had changed from "late January 2022" to January 4th or earlier.

Other evidence in the record shows the remaining undisputed events occurred in late 2021 and early 2022. On November 13, 2021, two individuals were arrested for trespassing at the building. (Doc. 93-2 at 8.) Akhtar first learned of the arrests in December 2021 when he received letters from the City of Mesa regarding the prosecution of the two individuals. (Doc. 93-2 at 8; Doc. 93-3 at 5–7.) Akhtar did not inspect the building until December 21, 2021. (Doc. 93-2 at 9.) During that inspection, Akhtar saw a door had been damaged but did not remember seeing any other damage at that time. (Doc. 93-2 at 9.) Nationwide's records indicate Akhtar called on January 4, 2022, to report the November vandalism incident. (Doc. 99-6 at 56.) Nationwide informed Akhtar that it would be a "separate claim" that would be established once additional details were provided. (Doc. 99-6 at 56.) On January 25, 2022, Nationwide received notice from Matei that the building had been "broken into many times" and the building had been stripped of copper. (Doc. 99-6 at 51.)

After the January 25 report, Nationwide opened Claim No. 879418-GM to address the vandalism damage. (Doc. 99-13 at 38.) On February 1, 2022, Nationwide sent the same inspector to evaluate this new claim who had evaluated the earlier car-crash claim. (Doc. 93-5 at 109.) The inspector observed both the exterior and interior to document the extent of damage. The inspector observed "human excrement all over the place, drug paraphernalia, clothing, stuff like that," indicating people had been squatting in the building. (Doc. 93-5 at 100.) Compared to his visit in September 2021, the inspector believed the "interior was obviously more damaged because of the – what the vagrants had done." (Doc. 93-5 at 100.) The exterior looked the same as it did in September 2021. Nationwide sent ALC a letter dated February 5, 2022, stating it had begun its investigation into the vandalism claim. That letter identified the loss date as November 13, 2021, based on that being the date the two individuals had been arrested. (Doc. 93-3 at 11.) The letter

requested ALC "complete and sign the enclosed Sworn Statement in Proof of Loss." (Doc. 93-3 at 11.) ALC never returned the sworn statement. After additional investigation, Nationwide issued its coverage decision on March 23, 2022. (Doc. 99-24 at 2.)

At the top of Nationwide's March 23 letter, the "Loss date" was identified as "November 13, 2021." The letter explained the "policy excludes vandalism and theft damage if your building where the loss occurred has been vacant for more than 60 days before the damages occur." (Doc. 99-24 at 2; *see also* Doc. 99-24 at 3 (policy excludes coverage where "the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs.").) Nationwide concluded the building "had been vacant for more than the 60 day policy limitation," so it denied ALC's vandalism claim.

An attorney for ALC responded to the claim denial with an email that included an attached letter. The subject line of the email was "Claim No. 879418-GM, Loss Date Nov. 13, 2021." (Doc. 93-3 at 29.) The top of the attorney's letter also identified the loss date as November 13, 2021. (Doc. 93-3 at 30.) The letter claimed the property "was under construction at the time of the loss" because "[b]etween July 20, 2021 and November 13, 2021, Gurr Brothers was regularly on site at the [property] doing construction and renovation work." (Doc. 93-3 at 30.) The attorney also stated the policy exclusion provided that "[b]uildings under construction or renovation are not considered vacant" and "[g]iven that the [property] was not vacant between July 20, 2021 and November 13, 2021," coverage could not be denied. (Doc. 93-3 at 31; *see also* Doc. 99-24 at 3 (policy exception to vacancy exclusion states, "Buildings under construction or renovation are not considered vacant.").)

The attorney included the May 2022 declaration he had drafted for Matei, which also identified the crucial period as the 60 days leading up to November 13. That declaration stated: "Between July 20, 2021, and November 13, 2021, Gurr Brothers was on-site . . . on a regular basis" and Gurr Brothers worked there "at least one day per week between July 20, 2021, and November 13, 2021." (Doc. 93-3 at 33.)

After receiving the attorney's letter and Matei's declaration, Nationwide decided to take examinations under oath of Akhtar and his office manager. After those examinations, Nationwide's counsel sent another letter to ALC's counsel. That letter again identified November 13, 2021, as the date of loss. (Doc. 93-4 at 2.) The letter recounted the results of Nationwide's additional investigation, including that "[t]he building was essentially vacant well before any type of damage or vandalism carried out . . . on November 13, 2021." (Doc. 93-4 at 3.) Based on the building being vacant prior to the date of loss, Nationwide again determined no coverage existed.

In November 2023, ALC filed this suit for breach of contract and bad faith. (Doc. 1-1 at 7.) The complaint alleged ALC "never made a claim . . . related to the November 13, 2021 break-in" and it was not until January 2022 that the extensive damage to the wiring and HVAC systems was discovered. (Doc. 1-1 at 5.) In the case management report, ALC did not identify the relevant date of loss. Instead, it claimed "the property was under construction or renovation at the time of the theft or vandalism." (Doc. 16 at 3.) Nationwide stated the "alleged vandalism and theft . . . appears to have occurred over a period of time including November 2021." (Doc. 16 at 3.) After a lengthy discovery period, Nationwide filed its motion for summary judgment. (Doc. 93.)

Nationwide's motion for summary judgment argues there is no dispute of fact that the property was vacant for 60 days before the date of loss both parties repeatedly referenced during the claims process, *i.e.*, November 13, 2021. (Doc. 93 at 8.) Because the policy does not provide coverage in that situation, Nationwide seeks summary judgment that it did not breach the contract. Nationwide also seeks summary judgment on the bad faith claim, arguing the only evidence is that it timely investigated ALC's claim and issued a claim denial less than eight weeks after the claim was made. (Doc. 93 at 17.) ALC opposes summary judgment by arguing November 13, 2021, was not the correct date of loss. ALC argues the case should proceed to trial where it will prove the "true date of loss" to show the building was not vacant prior to that date. (Doc. 99 at 10.) ALC does not identify what "true date" it will prove but it claims the "damage at issue likely

occurred . . . in late January 2022." (Doc. 99 at 9.) ALC also argues that even assuming November 13, 2021, was the correct date of loss, Matei's declarations and deposition show sufficient work was ongoing during the fall of 2021 so Nationwide's reliance on the vacancy provision was wrong.

## II. Analysis

Nationwide denied coverage under the vacancy exclusion in ALC's policy, and ALC contends that decision was incorrect under the renovation exception to the vacancy exclusion. Courts use state law to determine burdens of proof regarding insurance exclusions and exceptions. *See Zurich Am. Ins. Co. v. Ironshore Specialty Ins. Co.*, 964 F.3d 804, 806 (9th Cir. 2020) (certifying question regarding burden of proof for insurance exception to exclusion to Nevada Supreme Court). In Arizona, the insurer has the burden of proving a policy exclusion applies but the insured carries the burden of proving his claim falls within an exception to that exclusion. *Hudnell v. Allstate Ins. Co*. 945 P.2d 363, 365 (Ariz. Ct. App. 1997). It is therefore ALC's burden to prove the renovation exception applies.

Insurance companies use vacancy exclusions to protect themselves against the increased risk of loss inherent in a property being unoccupied for an extended period. *See Christie's Cabaret of Glendale LLC v. United Nat'l Ins. Co*., 562 F. Supp. 3d 106, 113-14 (D. Ariz. 2021). Renovation exceptions to those exclusions reflect the proportional reduction in risk for properties undergoing active renovations. *Id*. The activities on a property that count to make it "under . . . renovation" must therefore be dedicated to "restor[ing]" the property "to an earlier condition," requiring something more than routine cleaning, maintenance, or planning for a renovation. *Compare id*. at 111, 116 (moving chairs and alcohol, removing elevator shaft, and performing landscaping work could satisfy renovation exception), *and Glasser v. M&O Agencies, Inc*., No. 1 CA-CV 14-0708, 2015 WL 9096764, at *4 (Ariz. Ct. App. Dec. 15, 2015) (re-keying locks, installing fencing and landscaping, removing fixtures and debris, patching holes in walls, minor plumbing repairs, and fixing broken doors and windows could together be "renovation"), *with In re the*

*Matter of Tom Dubielak v. Travelers Prop. Cas. Co. of Am*., No. CV 10-270-TUC-RCC, 2011 WL 13118035, at *2 (D. Ariz. Aug. 5, 2011) (planning for renovation by obtaining estimates, permits, and creating plans did not show property was "under renovation"). Some courts have required activities at the property be "substantial and continuing" to trigger renovation-or-construction exceptions, but Arizona has not yet done so. *See Glasser*, 2015 WL 9096764, at *4.

Nationwide's motion for summary judgment first requires determining the correct date of loss. Only after identifying that date can the court determine what evidence should be examined to evaluate whether Nationwide properly invoked the policy's vacancy exclusion and whether ALC provided sufficient evidence to create a dispute of fact as to whether the renovation exception applies.

**A. Notice of Date of Loss**

The policy outlined ALC's "Duties in the event of loss or damage." (Doc. 93-2 at 282.) ALC was required to give Nationwide "prompt notice of the loss" and "[a]s soon as possible, give [Nationwide] a description of how, when and where the loss or damage occurred." (Doc. 93-2 at 282.) ALC was also required to send "a signed, sworn proof of loss containing the information [it] request[s] to investigate the claim." (Doc. 93-2 at 283.) Nationwide argues the only date of loss ALC identified before this litigation and up through summary judgment was November 13, 2021. (Doc. 110 at 1–2.) ALC claims it "never provided that date" and the facts show the date of loss was in "late January 2022." (Doc. 99 at 9.) To the extent ALC now believes the correct date of loss was "late January 2022," Nationwide claims ALC breached the policy provisions requiring "prompt" notice of the loss.

ALC does not explain its behavior regarding November 13, 2021, as the date of loss. Nationwide initially identified that date in its claim denial and ALC's attorney repeatedly confirmed that was the correct date. The attorney listed that date in his correspondence with Nationwide and argued the vacancy provision did not apply because repair work had been performed "[b]etween July 20, 2021 and November 13, 2021." (Doc. 93-3 at 30.) If

November 13, 2021, was *not* the date of loss, the arguments from ALC's attorney made no sense. Correspondence between the parties thereafter continually referenced November 13 as the date of loss, without objection from ALC. Based on the parties' communications throughout the claims process, it was reasonable for Nationwide to believe November 13, 2021, was the date of loss.

ALC now wishes to change the date of loss to an unidentified date in late January 2022. Nationwide responds that ALC's failure to provide that date earlier constituted a breach of the policy's notice provisions and it has been prejudiced by that breach.

In general, "an insurance company is not relieved of its contractual liability because of the insured's failure to give notice unless it can show that it has been prejudiced thereby." *Lindus v. N. Ins. Co. of N.Y.*, 438 P.2d 311, 315 (Ariz. 1968). "Delay [in providing notice] alone does not establish prejudice." *Liberty Mut. Fire Ins. Co. v. Mandile*, 963 P.2d 295, 302 (Ariz. Ct. App. 1997). Rather, the burden is on the insurer to prove "actual prejudice resulting from the delay." *Id.* An insurer must therefore offer more than hypothetical prejudice. *See Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 236 P.3d 421, 434 (Ariz. Ct. App. 2010) (rejecting argument that failure to obtain releases was prejudice because insurer did not identify any demands "that would have been barred by such a release"). But prejudice exists where an insured's delay or change in position materially impairs the insurer's ability to investigate the coverage theory ultimately asserted. *See Nguyen v. Am. Fam. Mut. Ins. Co.*, No. CV-12-2103-PHX-SMM, 2014 WL 4448410, at *7–9 (D. Ariz. Sept. 10, 2014) (finding prejudice where insured changed alleged date of storm loss after intervening repairs and storms prevented the insurer from investigating the newly-identified loss date).

There is prejudice here. ALC repeatedly identified November 13, 2021, as the loss date, and its attorney specifically argued that Gurr Brothers had performed construction or renovation during the 60 days up to that date. Nationwide opened the vandalism claim using that date, repeatedly identified it in its correspondence, and received no objection from ALC. But ALC now contends the widespread damage "likely occurred" on an

unidentified date in late January 2022. That theory substitutes a materially different 60-day period and makes alleged construction leading up to January 2022 central to the coverage inquiry.

ALC's delay impaired Nationwide's ability to investigate the new date-of-loss theory. Nationwide's February 2022 inspection documented the property only after the damage had accumulated. It did not establish when the electrical, HVAC, plumbing, and roof damage occurred or permit Nationwide to allocate that damage among the November incident and any later ones. And by the time of his deposition, Matei—the principal witness concerning both the repairs and discovery of the vandalism—could not identify who visited the property, what work was performed, or when it occurred, and gave conflicting accounts of whether the extensive damage existed by January 4 or was discovered later. Given the four-plus-year gap since January 2022, evidence undoubtedly has been lost, memories have faded, and Nationwide has no way of conducting a meaningful investigation. The resulting loss of date-specific evidence prejudices Nationwide. *See id*.

ALC therefore may not rely on an unidentified late-January 2022 loss to avoid the vacancy exclusion. The remaining issues are whether Nationwide breached the contract and committed bad-faith claims handling by denying the claim using November 13, 2021, as the date of loss. That requires the court assess the admissibility of the evidence from Matei, the only evidence ALC cites to establish the renovation exception applied in the fall of 2021.

**B. Matei's Declarations and Deposition**

Matei's declarations state work was occurring at least one day per week from July 2021 through November 2021. When Nationwide deposed Matei, he no longer had any memory of dates and events supporting the statements in his declarations. His declarations are too conclusory to defeat summary judgment and, even if not conclusory, ALC needed to offer some explanation for the dramatic differences between those declarations and his deposition or point to the admissible evidence used to create the declarations.

A declaration used at summary judgment must be based on personal knowledge, set

out facts that would be admissible in evidence, and show that the declarant is competent to testify about those facts. Fed. R. Civ. P. 56(c)(4). A party may object at summary judgment that evidence cannot be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). Nationwide does so here, claiming Matei's deposition establishes the statements in his declarations could not be presented in an admissible form. (Doc. 110 at 7.) Nationwide is correct.

"A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). A declaration may also be insufficient when its assertions are "based on inadmissible hearsay." *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001). A court need not invoke the "sham affidavit" doctrine to conclude facially insufficient declarations are inadequate to defeat summary judgment.[1] *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1064 (9th Cir. 2012).

Matei's declarations recount some discrete events, but their central material assertion—that Gurr Brothers performed work at the property at least one day per week during the relevant 60-day period—does not identify who performed the work, what work was performed, or when it occurred. The declarations also do not identify records or other evidence supporting that central assertion. When questioned at his deposition, Matei could not supply those missing details. Even when presented with Gurr Brothers' own business records, he could not identify visits during the relevant months, describe the alleged weekly

---

[1] Although the logic underlying "sham affidavit" doctrine also seemingly applies to Matei's declarations (the first of which was drafted by plaintiff's counsel, with no material changes in the second), the Ninth Circuit has stated "the sham affidavit rule applies only to declarations by the parties, not to declarations by non-party witnesses." *See Foster v. City of Indio*, 908 F.3d 1204, 1213 (9th Cir. 2018) (quoting *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009)). *Foster* appears to overstate *Nelson*'s holding, which was explicitly qualified. *Nelson*, 571 F.3d at 929 n.2 ("Nor does anything in this opinion preclude a trial judge from excluding a third party affidavit in an appropriate case, with findings supporting the conclusion that it is truly a 'sham affidavit,' manufactured for the purpose of avoiding summary judgment by creating a genuine issue of material fact."). In doing so, *Foster* created a conflict with several other circuits that apply "sham affidavit" doctrine to non-parties, at least in circumstances suggesting a party influenced the declaration. *See, e.g.*, *Adelman-Tremblay v. Jewel Cos.*, 859 F.2d 517, 521 (7th Cir. 1988); *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014); *Santhuff v. Seitz*, 385 F. App'x 939, 944–45 (11th Cir. 2010).

work, or explain how the timeline in his declarations had been reconstructed. Nor did counsel provide, or even hint at the existence of, the materials Matei used to create his declarations.

Matei testified at his deposition that he prepared his declarations by reviewing unidentified business records and speaking with unidentified individuals. When presented with the business records, Matei admitted they did not reflect any work performed during the relevant period. So Matei could not, in fact, have relied on those records. The only remaining possibility is Matei prepared the declarations based on statements from other individuals. But those statements would be hearsay and a declaration based on hearsay cannot defeat summary judgment. *Block*, 253 F.3d at 419.

Matei would not be permitted to testify at trial on topics where he now lacks all personal knowledge but, at some point in the past, he believed because of hearsay. Matei's unsupported assertions that work occurred at least one day per week do not create a genuine dispute of fact and therefore will not be considered when evaluating the summary judgment motion.

**C. Vacancy Provision and Breach of Contract**

Having determined the date of loss and that the contents of Matei's declarations would not be admissible at trial, the only remaining dispute is whether Nationwide properly applied the policy's vacancy exclusion given ALC's invocation of the renovation exception. That provision applied if the property was vacant and not under renovation in the 60 days leading up to November 13, 2021. Other than Matei's declarations, ALC's only evidence of work during that period is two portions of Matei's depositions. (Doc. 99 at 3.) Matei initially testified the exterior and interior claddings were done "[a]round September . . . September, close to October" and the exterior stone was "done in "probably September, October. Probably close to November." (Doc. 99-8 at 24.) But later in his deposition, Matei was asked about these statements and conceded he did not know when the work was done. (Doc. 99-8 at 47.) At one point, Matei testified that removal of the stone was "one of the last things we were doing there . . . because we have to do framing first." (Doc. 93-2 at

108.) And Matei conceded the framing did not start until January 10, 2022. (Doc. 99-8 at 44.) Thus, Matei's own deposition established his earlier (imprecise) statements regarding the timing of the work were not based on the type of personal knowledge that might serve to defeat summary judgment. Matei's contradictory and conclusory deposition testimony is not enough to create a dispute of fact. *Publ'g Clearing House, Inc.*, 104 F.3d at 1171.

ALC provided no evidence that would be admissible at trial of work performed on the building in the 60-day period prior to November 13, 2021. With no evidence of work, there is no dispute of fact whether the vacancy provision applies. Nationwide is entitled to summary judgment on ALC's breach-of-contract claim.

**D. Claims Handling**

Nationwide did not breach the contract but that does not necessarily preclude ALC's bad faith claim. "[A]bsence of a breach of an express term of the policy is not fatal to a bad faith claim where the plaintiff can prove a breach of the implied covenant of good faith and fair dealing." *Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1270 (Ariz. 1992). That implied covenant may be breached when an insurer fails to "conduct an adequate investigation," acts unreasonably "in evaluating the claim," or "force[s] an insured to go through needless adversarial hoops." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000).

ALC argues there are disputes of fact regarding Nationwide's good-faith claims handling based on the unreasonable delay in "opening the vandalism claim," the failure to keep sufficient internal records, misapplication of the vacancy provision, and an inadequate investigation into "the timing and number of occurrences." (Doc. 99 at 14–16.) It is not clear what ALC means in complaining the vandalism claim was not opened early enough. The claim was opened at the end of January, which is when ALC now claims the damages occurred. (Doc. 99 at 14; Doc. 99-13 at 38.) Even assuming the vandalism claim should have been opened sooner, ALC has not explained what harm *it* suffered as a result. Nor does ALC explain why Nationwide's internal records were insufficient, and the court has already concluded the vacancy provision was correctly applied.

As for the allegedly inadequate investigation, ALC did not timely report the losses it now claims and never disputed Nationwide's view that the relevant date of loss was November 13, 2021. Using that date of loss, Nationwide investigated and made its decision quickly after ALC submitted its claim. ALC does not point to any admissible evidence showing Nationwide's behavior regarding note-keeping or investigation was unreasonable and that Nationwide "either knew or was conscious of the fact that its conduct was unreasonable." *Id.* Nationwide is entitled to summary judgment on the bad faith claim.

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 93) is **GRANTED**. The Clerk of Court shall enter judgment in favor of defendant and close this case.

Dated this 11th day of September, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**